Robert A. JONES; Cynthia White; Larry White; and Reginald P. Youngblood (Real Parties in Interest), Appellants,

v.

Hon. Roger L. CRITTENDEN, Judge, Franklin Circuit Court; Kentucky Department of Military Affairs; and Kentucky National Guard, Appellees.

No. 2001–SC–0761–MR.

Supreme Court of Kentucky.

Nov. 21, 2002.

As Amended March 5, 2003.

Barbara D. Bonar, Covington, Squire N. Williams, Jr., Stoll, Keenon & Park, Frankfort, for Appellants.

William B. Pettus, Assistant Attorney General, Civil and Environmental Law, Frankfort, for Appellees.

Opinion of the Court by Justice GRAVES.

## I. FACTS

Appellants/Real Parties in Interest, Robert A. Jones, Cynthia White, Larry White, and Reginald Youngblood, are current or former members of the Kentucky National Guard, who have brought claims for discrimination and retaliation pursuant to the Kentucky Civil Rights Act, Ky.Rev. Stat. (KRS) 344.010, *et seq.* The Kentucky National Guard and Kentucky Department of Military Affairs moved the Franklin Circuit Court for summary judgment, arguing that the actions raise a federal constitutional question which is preempted from state regulation and is not justiciable or reviewable in a civilian court by virtue of the Supremacy Clause and the Militia Clause of the United States Constitution. The circuit court denied the motion.

The Kentucky Department of Military Affairs and Kentucky National Guard filed a petition for writ of prohibition or mandamus pursuant to CR 76.36 requesting that the Court of Appeals direct the trial judge, Honorable Roger L. Crittenden, "to refrain from compelling petitioners to stand trial" and to direct him to dismiss the claims. The Court of Appeals granted the writ. We affirm the decision of the Court of Appeals.

## II. THE NATIONAL GUARD IS AN INTEGRAL PART OF THE FEDERAL SYSTEM

The National Guard has a unique status in our federal system and a vital role in our national defense. The militia, which is the military forebear of the National Guard, is expressly provided for in the Constitution: "A well regulated Militia... [is] necessary to the security of a free State...." [1] Each state is thus empowered to maintain a militia and each state in fact maintains a militia, the modern equivalent of which is the National Guard. [2] Control of the Guard is reserved to the states, except when the Guard is called into federal service, at which time the Guard becomes subject to exclusive federal control. [3]

Congress first provided for the integration of militia and federal military forces in the National Defense Act of 1916, which made the National Guard part of the Regular Army. [4] Under the 1916 Act, all members of the National Guard were required to take oaths to obey both the President and the governors of their states. [5]

In 1933, Congress made the National Guard a permanent part of the federal

1. U.S. Const. amend. II. The second amendment provides in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

2. *Maryland v. United States*, 381 U.S. 41, 46–47, 85 S.Ct. 1293, 1297, 14 L.Ed.2d 205 (1965), *vacated on other grounds*, 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965).

3. "The President shall be Commander in Chief of the ... Militia of the several States when called into actual Service of the United States...." U.S. Const., art. II, § 2. Congress is tasked with "governing such Part of

[the militia] as may be employed in the Service of the United States." Id., art. I, § 8, cl. 16. Congress is authorized to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." Id., art. I, § 8, cl. 15.

4. U.S. Const., art. I, § 8, cl. 15; *see also Johnson v. Powell*, 414 F.2d 1060, 1063 (5th Cir.1969).

5. *Dukakis v. U.S. Department of Defense*, 686 F.Supp. 30, 34 (D.Mass.1988), *aff'd*, 859 F.2d 1066 (1st Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1743, 104 L.Ed.2d 181 (1989).

military by creating a "dual-enlistment" system:

It did this by conferring a new status on the Guard, by constituting it a reserve component of the Army, to be known as the National Guard of the United States. In its militia capacity, the National Guard was organized and administered under the militia clause of the Constitution, and available only for limited duties.... [I]n its capacity as a reserve component of the Army, [the National Guard] was organized and was to be administered under the army clause.[6]

As a result of having constitutional moorings in both the Militia Clause and the Armies Clause, the Guard's role in our federal system is uniquely dualistic

This role does not fit neatly within the scope of either state or national concerns; historically the Guard has been, and today remains, something of a hybrid. Within each state the National Guard is a state agency, under state authority and control. At the same time, the activity, makeup, and function of the Guard is provided for, to a large extent, by federal law.[7]

Accordingly, the National Guard has today a dual status, and every Guardsman is a reservist in the United States Uniformed Services as well as a militiaman.[8]

In 1970, the National Guard was incorporated into the Total Forces Concept, which determines the total number of military personnel needed for our national defense and military commitments.[9] Thus, the Guard plays a vital role in the nation's military readiness program.

Due to the Guard's vital role in the Total Forces Concept, the Federal Government must ensure the Guard maintains a constant state of military readiness. To this end, the Constitution empowers Congress to provide for organizing, arming, and disciplining the Militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress.[10] Pursuant to this authority, Congress has enacted legislation for equipping, training, and disciplining state Guard units so that Guardsmen are "an integral part of the first line defenses of the United States."[11] Congress also has created the National Guard Bureau, an adjunct of the Departments of the Army and the Air Force, to oversee state Guard units and to ensure compliance with federal statutory and regulatory requirements regarding military training,

6. Weiner, "The Militia Clause of the Constitution," 54 Harv. L.Rev. 181, 208 (1940).

7. *Johnson v. Orr*, 780 F.2d 386, 388 (3d Cir. 1986) (*quoting New Jersey Air National Guard v. Fed. Labor Rel. Auth.*, 677 F.2d 276, 278–79 (3d Cir.1982)).

8. *Dukakis, supra.*

9. *See Bruton v. Schnipke*, 370 F.Supp. 1157, 1163 (E.D.Mich.1974).

10. U.S. Const., art. I, 8, cl. 16.

11. 32 U.S.C. 102 (1982). Congress has provided that Guardsmen's training and discipline must conform to that of their federal counterparts, see 32 U.S.C. § 501 (1982), and that Guardsmen are subject to the Uniform Code of Military Justice. See id. §§ 326–333. Additionally, Congress has authorized the President to issue regulations and orders necessary to organize, discipline, and govern the National Guard. See id. § 110. See also 10 U.S.C. § 105 (1982) (authorizing inspections of National Guards by Secretary of the Army and Secretary of the Air Force to ensure Guard units are properly organized, uniformed, armed, equipped, trained, and instructed).

discipline, and readiness.[12] State Guard units that fail to comply are subject to forfeitures of federal funds and benefits.[13] Thus, the National Guard stands ready to provide "trained units and qualified persons ... for active duty in the armed forces, in the time of war or national emergency and at such other times as the national security requires." [14]

## III. NONJUSTICIABILITY

■ As early as 1953, the Supreme Court determined that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian." [15] Since that time, in reviewing issues which deal with the armed forces, the Supreme Court has regularly referred to the military as a "separate community" and reviewed claims against the military differently from claims against any other governmental agency. Restrictions on constitutional rights which might have no rational basis in civilian society will survive in the military context because the unique war-making purpose of the armed forces makes such restrictions compelling.[16] This attitude regarding constitutional rights is based upon the need to maintain an effectively operational fighting force.[17] The distinct purpose of the armed forces is to protect the United States, and its interests, against the actions of foreign nation-states, through the use of force.[18] It is because of this unique purpose that the military demands a respect for duty and a commitment to discipline that is without counterpart in civilian society.[19] Military effectiveness in wartime, however, requires peacetime preparation. In order for soldiers, airmen and seamen to utilize those qualities necessary for success on the battlefield, with all its stress and anxiety, those qualities must be instinctive. Success in war is therefore contingent upon the development of those qualities in peacetime. The Supreme Court has stated that, "to accomplish its mission the military must foster instinctive obedience, unity, commitment and esprit de corps." [20]

This creates a "necessity," which the Supreme Court has recognized, for train-

12. 10 U.S.C. § 3040 (1982).

13. Section 108 of Title 32 provides: If, within a time to be fixed by the President, a state does not comply with or enforce a requirement of, or regulation prescribed under, this Title its National Guard is barred, wholly or partly as the President may prescribe, from receiving money or any other aid, benefit, or privilege authorized by law. 32 U.S.C. 108 (1982).

14. 10 U.S.C. § 262 (1982).

15. *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

16. *See Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2365–66, 76 L.Ed.2d 586 (1983) ("'[N]o military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting.... [C]enturies of experience have developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns." *Id.*).

17. *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (the military effectively prohibited a member from criticizing the American role in the Vietnam War).

18. In *United States ex rel. Toth v. Quarles,* the Supreme Court said that the primary business of the military is "to fight or be ready to fight wars should the occasion arise." 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955).

19. *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975).

20. *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986); *see also Chappell, supra; Greer v. Spock,* 424 U.S. 828, 843–44, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505 (1976) (Powell, J., concurring).

ing and organizational latitude when dealing with military personnel and the military infrastructure. "The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection.... [C]onduct in combat inevitably reflects the training that precedes combat." [21]

The Supreme Court has long recognized that:

[T]he military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that 'it is the primary business of the armies and navies to fight or be ready to fight wars should the occasion arise.' [22]

A soldier in the Army is not free to quit his job, cannot be fired, and is subject to military discipline and military law.

The climate of "discipline and unquestioned obedience" necessary to sustain an effective fighting force is determined primarily by the professional judgments and experience of people familiar with military needs, and the Court has determined itself incapable of mastering the complexities

which are considered when balancing constitutional rights against military functional necessity.[23] In *Chappell*, the United States Supreme Court stated that "the special relationships that define military life have 'supported the military establishment's broad power to deal with its own personnel. The most obvious reason is that courts are ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.' " [24]

It would be imprudent to allow soldiers to sue superior officers because discipline and effectiveness would be seriously damaged. Permitting judicial intervention into such clearly administrative and personnel decisions would destroy the legitimacy and authority of command.[25]

Power to regulate the militia was conferred by the Constitution, not on the courts, but upon Congress and the President. Judges are not given the task of running the Army. The responsibility for creating channels through which such grievances can be considered and fairly resolved rests upon the Congress and upon the President of the United States and his subordinates. "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." [26]

As stated in *Parker v. Levy, supra:*

---

21. *Chappell, supra,* 462 U.S. at 300, 103 S.Ct. at 2366 (citations omitted); *see also Goldman,* 475 U.S. at 508, 106 S.Ct. at 1313 ("the necessary habits of discipline and unity must be developed in advance of trouble.").

22. *Parker, supra,* 417 U.S. at 743, 94 S.Ct. at 2555–56 (*quoting Quarles, supra,* 350 U.S. at 17, 76 S.Ct. at 5).

23. James M. Hirschorn, The Separate Community: Military Uniqueness and Servicemen's Constitutional Rights, 62 N.C.L.Rev. 177, note 4, at 203 (1984).

24. 462 U.S. at 305, 103 S.Ct. at 2368 (*quoting* Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181, 187 (1962)).

25. Problems or complaints which arise under such circumstances have been provided for by Congress in 10 U.S.C. § 938, Art. 138 of U.C.M.J.

26. *Orloff, supra,* 345 U.S. at 94, 73 S.Ct. at 540.

The armed forces depend upon a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.[27]

## IV. CONSTITUTIONAL LIMITATION

The Constitution of the United States, Article VI, provides in pertinent part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof[,] . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Constitution of the United States, Article I, Section 8, clause 16, gives Congress the power:

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress[.]

The Constitution of Kentucky, Section 220, gives to the Kentucky Legislature the power to maintain and regulate the "Militia." However, Section 221 includes the following directions: "The organization, equipment and discipline of the militia shall conform as nearly as practicable to the regulations for the government of the armies of the United States."

In *Perpich v. Dep't of Defense* [28], the United States Supreme Court defined the status of a state National Guard:

Since 1933, all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States.

. . .

In a sense all of them now must keep three hats in their closets—a civilian hat, a state militia hat, and an army hat—only one of which is worn at any particular time. When the state militia hat is being worn, 'drilling and other exercises' . . . are performed pursuant to 'the Authority of training the Militia according to the discipline prescribed by Congress.'

. . .

[The Militia Clause] merely recognizes the supremacy of federal power in the area of military affairs.

. . .

[T]he constitutional allocation of powers in this realm [gives] rise to a presumption that federal control over the Armed Forces [is] exclusive.[29]

In *Feres v. United States*,[30] service members sustained injuries in the course of military service due to the negligence of other service members. The United States Supreme Court held that the government is not liable for injuries to servicemen where the injuries "arise out of or are in the course of activity incident to service." [31]  Citing to *United States v.*

---

27. 417 U.S. at 759, 94 S.Ct. at 2563 (citations omitted.).

28. 496 U.S. 334, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990).

29. *Id.* at 345–353, 110 S.Ct. at 2425–2429.

30. 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

31. *Id.* at 146, 71 S.Ct. at 159.

*Standard Oil Co.,*[32] the *Feres* Court stated:

> To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequence of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority.[33]

The *Feres* Court pointed out that no American law had ever permitted a soldier to recover for negligence either against his superior officers or the Government he was serving, and declined to impute to Congress such a radical departure from established law in the absence of express Congressional mandates.[34] *Feres* not only bars intra military damage actions but also protects the integrity of the command relationship by avoiding judicial intrusion into the military structure absent an explicit congressional mandate.

In addressing this same issue, the Sixth Circuit Court of Appeals stated:

> Consistent with the reasoning in *Chappell,* courts of appeals have consistently refused to extend statutory remedies available to civilians to uniformed members of the armed forces absent a clear direction from Congress to do so. Thus, uniformed members of the armed forces have no remedy under Title VII of the Civil Rights Act of 1964.[35]

Although Congress has not enacted statutes expressly preempting state regulation of discrimination suits against military authorities, the federal scheme described above strongly suggests that the field has been impliedly preempted by federal law. Additional support for this conclusion is found in the long line of United States Supreme Court cases beginning with *Feres* and continuing with its progeny on a consistent pattern of expansion of the *Feres* doctrine. Language authored by the Sixth Circuit emphasizes this point:

> Review of these Supreme Court precedents makes it clear that in recent years the Court has embarked on a course dedicated to broadening the *Feres* doctrine to encompass, at a minimum, *all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military, without regard to the location of the event, the status (military or civilian) of the tortfeasor, or any nexus between the injury-producing event and the essential defense/combat purpose of the military activity from which it arose.[36]

The unique and delicate relationship between uniformed personnel and their superiors would be negatively affected if civilian courts, federal or state, were empowered with the jurisdiction to adjudicate discrimination claims brought by servicemen, which would necessarily involve testimony by the officers accused of misconduct and would require the court to analyze military decisions taken with regard to the controversy. As decided in *Chappell, supra,* civilian courts are "ill-equipped" to evaluate the impact of such actions nonmilitary discipline and "must, at the very least, hesitate long before entertaining a suit which asks the court to

---

**32.**  332 U.S. 301, 305–306, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1947).

**33.**  *Feres, supra,* 340 U.S. at 143–144, 71 S.Ct. at 159.

**34.**  *Id.* at 141–142, 71 S.Ct. at 157.

**35.**  *Coffman v. State of Michigan,* 120 F.3d 57, 59 (6th Cir.1997).

**36.**  *Major v. United States,* 835 F.2d 641, 644 (6th Cir.1987).

tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessary unique structure of the military establishment." [37] We doubt that Congress wanted such a scenario. Moreover, the real parties in interest do have a remedy by availing themselves of the provisions of the National Guard Military Discrimination Complaint System.

■ The Supreme Court's rationale in *Feres, supra,* and its progeny proscribe suits based on civil rights statutes. The *Feres* doctrine generally bars soldiers' suits for service-related injuries absent an express congressional command to the contrary. The *Feres* doctrine stems not only from practical considerations regarding the deleterious impact of judicial interference on the command relationship. The doctrine stems as well from consideration of constitutional significance because the Constitution vests Congress and the President, not the judiciary, with plenary Constitutional authority over the military. The Kentucky National Guard is an integral component of the United States Uniform Services. Consequently, we hold that claims brought by Kentucky National Guardsmen pursuant to KRS Chapter 344 for injuries while in military service are not justiciable because Congress has not expressly permitted such suits.

We affirm the decision of the Court of Appeals.

LAMBERT, C.J., COOPER, GRAVES, and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., dissents in a separate opinion in which STUMBO, J., joins.

KELLER, J., dissents in a separate opinion.

Dissenting Opinion by Justice JOHNSTONE.

I respectfully dissent. While the majority fashions an eloquent argument in support of its position, that argument merely attempts to evade the democratic and unambiguous purpose of the Kentucky Civil Rights Act, which is "[t]o safeguard *all* individuals within the state from discrimination." KRS 344.020 (emphasis added). The majority's judicial machinations aside, there is no exception to the Civil Rights Act for the Kentucky National Guard or the Kentucky Department of Military Affairs.

The Appellants in this case were undeniably serving the Commonwealth at the time of the alleged events. As the majority correctly notes, "[t]he Constitution of Kentucky, Section 220, gives to the Kentucky Legislature the power to maintain and regulate the 'Militia.'" Op. at 18. Moreover, the Governor is the Commander–In–Chief of the militia, except when it is called into the service of the United States. Ky. Constitution § 75. And significantly, Kentucky Guardsmen are in the service of the Commonwealth "unless and until ordered to active duty." *Perpich v. Dept. of Defense,* 496 U.S. 334, 345, 110 S.Ct. 2418, 2425, 110 L.Ed.2d 312, 325 (1990). Only when "that triggering event occurs does a Guardsman become a part of the Army and lose his status as a state serviceman." *Gilbert v. United States,* 165 F.3d 470, 473 (6th Cir.1999) (quoting *United States v. Hutchings,* 127 F.3d 1255, 1258 (10th Cir.1997)). The fact that the Kentucky National Guard receives federal funds does not alter the status of the Guardsmen: "the issue of status depends on command and control and not on whether ... state or federal funds are being used...." *Gilbert* at 473. In this

---

**37.** *Chappell,* 462 U.S. at 300, 103 S.Ct. at 2366.

case, none of the plaintiffs had been called to active duty, so they were still under the state's control.

The Kentucky Civil Rights Act provides that any person who has been injured under the Act "shall have a civil cause of action in Circuit Court." KRS 344.450. And the state is not above suit for violation of the Act. In *Dept. of Corrections v. Furr*, Ky., 23 S.W.3d 615, 617 (2000), this Court held that the state has waived sovereign immunity for claims under KRS 344:

> What hollow words indeed if the safeguard against discrimination does not include the right to be free from acts of discrimination committed by the Commonwealth itself, or in its name.
>
> . . . .
>
> To immunize the Commonwealth from the application of the Kentucky Civil Rights Act frustrates the act's purpose and intent, deprives many of its citizens of its protection, and renders meaningless its pledge to safeguard *all individuals* from discrimination.

(Emphasis in original). These facts led the Franklin Circuit Court in this case to properly conclude: "[W]hile the Plaintiffs were under the exclusive command of the Kentucky National Guard, the laws of the Commonwealth of Kentucky applied.... [And] the Kentucky National Guard, while under state control, must abide by the provisions set forth in KRS 344."

The majority claims that Appellants' suits against the Kentucky National Guard and the Kentucky Department of Military Affairs are nonjusticiable because "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian." Op. at 16 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842, 849 (1953)). In fact, "discipline" is a motif running throughout the majority opinion: some form of the word is used no less than

nineteen (19) times. With such heavy reliance on the term, it makes sense to have a clear understanding of its meaning. The majority seems to ascribe at least three (3) different meanings to "discipline." In the quote above, from *Orloff*, "discipline" refers to a formal grievance procedure or judicial protocol. Examples of discipline in this sense include the Uniform Code of Military Justice (*see Chappell v. Wallace*, 462 U.S. 296, 302, 103 S.Ct. 2362, 2366–67, 76 L.Ed.2d 586, 592 (1983)), the Board for Correction of Naval Records (*see id.*), and the National Guard Military Complaint System (*see* op. at 20). The word "discipline" also denotes a state of preparation or fitness. *E.g.*, "It is because of this unique purpose that the military demands a respect for duty and a commitment to discipline that is without counterpart in civilian society." *See* op. at 16. The third use of the word "discipline" is in the context of punishment. *E.g.*, "A soldier in the Army is not free to quit his job, cannot be fired, and is subject to military discipline and military law." *See* op. at 17.

But all of this discussion about discipline just diverts attention from the facts of the present case. The complainants in this case did not file suit based on a disciplinary matter, they claimed they were discriminated against. Failing to promote a Guardsman because of race, transferring a Guardsman because of race, or calling a Guardsman "nigger" or "black bitch," if true, is not "discipline" of the type the majority claims is "prescribed by Congress." Nor is it any other form of "discipline" that could be properly sanctioned, either by the military or any other institution. And it certainly is not the type of protected military action that is, according to the majority, designed to "foster instinctive obedience, unity, commitment and esprit de corps." Op. at 16 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507, 106

S.Ct. 1310, 1313, 89 L.Ed.2d 478, 484 (1986)). Such treatment demonstrates unabashed racial bigotry.

But if there is a military or nondiscriminatory reason to support the treatment these Guardsmen received, I do not believe it is beyond the comprehension of a civilian to grasp. As Justice Oliver Wendell Holmes famously observed in a slightly different context but with equal effect here: "Even a dog knows the difference between being kicked and being tripped over." And to address the majority's fears of a complete breakdown of military "discipline" if civil rights suits against the Guard are brought in civilian court, I offer Justice Scalia's dissenting remarks in *United States v. Johnson:* "I do not think the [adverse] effect upon military discipline is so certain, or so certainly substantial, that we are justified in holding ... that [the Legislature] did not mean what it plainly said in the statute before us." *Johnson,* 481 U.S. 681, 699, 107 S.Ct. 2063, 2073, 95 L.Ed.2d 648, 664 (1987) (Federal Tort Claims Act case involving a serviceman negligently killed while on duty. Three Justices joined Justice Scalia's dissenting opinion, which eviscerated *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950)). Racial discrimination is a vile vestige from a bygone era in the history of our nation and our state. Permitting the Kentucky National Guard to continue to evade responsibility for its discriminatory acts—if it committed those acts—simply because it is a military body, will only make this Court an accomplice in entrenching that institution on the wrong side of history. And *all individuals* in our Commonwealth will be worse off for it.

The majority also claims that the Supremacy Clause bars Appellants' claims: "Although Congress has not enacted statutes expressly preempting state regulation of discrimination suits against military authorities, the federal scheme described above strongly suggests that the field has been impliedly preempted by federal law." Op. at 19. Not only does the majority's argument rely heavily on *Feres, supra,* an opinion whose inherent shortcomings were pointed out in *Johnson, supra,* but the argument also misapprehends federal constitutional law. The majority is correct that the Militia Clause clearly gives Congress power over military affairs and specifically power over disciplining the militia. But these premises ignore the facts established above; namely, that Appellants do not complain about matters of "discipline"—they decry alleged acts of blatant discrimination—and when the Kentucky National Guard has not been called into active service, it remains under the regulation of the Kentucky Legislature.

Preemption can occur in three ways: (1) Congress expressly intends to preempt a state law; (2) Congress "occupies the field" of regulation; or (3) compliance with both federal and state regulations is a physical impossibility. *Gustafson v. City of Lake Angelus,* 76 F.3d 778, 782–83 (6th Cir.1996). Congressional intent is the focus of a preemption inquiry. *Id.* at 783. The majority concedes that nothing in the Militia Clause, or any subsequent federal regulation, expressly prevents state legislatures from extending civil rights coverage to state Guards. And though courts may hold that Congress exempted the federal military from Title VII civil rights claims, that limitation is a far cry from implied preemption preventing states from extending those rights to state Guards. In the absence of a conflict, States are permitted to extend their citizens protections greater than federal law provides. The Kentucky Legislature has done just that with KRS 344, a fact we recognized in *Meyers v. Chapman Printing,* Ky., 840 S.W.2d 814, 817 (1992):

One important purpose of the Kentucky Civil Rights Act was to incorporate the anti-discrimination "policies embodied" in the Federal Civil Rights Acts of 1964 (P.L. 88–352, Title VII—Equal Employment Opportunity) as amended. . . . *But there are further purposes expressed in the Kentucky statute not specified in the Federal,* including "protect[ing] . . . personal dignity and freedom from humiliation." Whereas the policies embodied in the Kentucky Act are the same as the federal counterpart, *the statutory remedy provided through the court system differs markedly* because of these further policy statements and because of the difference in remedy provided in KRS 344.450 as contrasted with those provided in the Federal Act. . . .

(Internal citations omitted, emphasis added). KRS 344 was modeled after Title VII, both statutes are designed to protect civil rights, and they do so in the same manner. There simply is no conflict between the state and the federal laws, and the fact that KRS 344 extends greater protections than Title VII does not create such a conflict. KRS 344 plainly says that any individual who has been harmed under the Act may bring suit in Circuit Court. There is no exemption for the Kentucky National Guard. The limitations that apply in federal settings do not likewise apply to state matters. Even the Supreme Court in *Chappell, supra,* conceded that some civil rights violations in the military might properly be brought in civilian courts: "This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell,* 462 U.S. at 304, 103 S.Ct. at 2368, 76 L.Ed.2d at 594 (1983).

Despite the majority's attempt to cloak the Kentucky Department of Military Affairs and Kentucky National Guard in the armor of federal protection, that organization remains subject to the provisions of KRS 344 and is not entitled to summary judgment in this case. As a circuit judge, I presided over a factually similar case in *Moore v. Kentucky Department of Military Affairs and Army National Guard,* 92–CI–06861 (unpublished). In denying the defendant's motion to dismiss in *Moore,* I reached the same result then as I do today:

> KRS 344.040 makes it unlawful for an employer to discriminate against an individual on the basis of race or sex, as well as other classes. KRS 344.030 defines "employer" as "a person who has eight (8) or more employees within the state in each of twenty (20) or more calendar weeks in the current or preceding calendar year. . . ." And KRS 344.010(1) defines "person" to include "the state, any of its political or civil subdivisions or agencies."
>
> The Department of Military Affairs, Army National Guard is attached to the office of the governor. KRS 36.010(5). As such, it falls within the definitions and provisions of KRS Chapter 344, and specifically KRS 344.010(1). Consequently, the Guard is subject to suit under KRS Chapter 344, and this Court does have subject matter jurisdiction. . . .

*Moore,* Order Denying Motion to Dismiss at 3–4 (January 12, 1993). Though a decade has passed since *Moore,* I steadfastly believe that this disposition alone faithfully complies with both the letter and spirit of the law.

STUMBO, J., joins this dissenting opinion.

Dissenting Opinion by Justice KELLER.

I respectfully dissent. When this Court decided *Department of Corrections v. Furr*

(*"Furr"*),[1] I joined Justice Cooper's dissenting opinion[2] because I believed then—and I believe now—that agencies of the Commonwealth cannot be sued for money damages in Circuit Court under the Kentucky Civil Rights Act because the General Assembly has not "specifically and expressly" waived their immunity. I recognize, however, that a majority of this Court concluded otherwise and held that "KRS 344.450 provides a cause of action against the Commonwealth for violations of the Kentucky Civil Rights Act."[3] Accordingly, although I would vote to overrule *Furr* if three other members of this Court would join me, I recognize that the lawsuit that is the subject of this appeal sprung forth from *Furr,* and thus, in order to resolve the issues presented here, I must temporarily set aside my views and apply the Court's precedent. After doing so, I believe the Court of Appeals erred when it granted the extraordinary relief requested by the Appellees. In fact, I do not believe it is necessary to reach the merits of this action because the Appellees' failure to demonstrate the inadequacy of post-trial appellate review is, standing alone, fatal to their CR 76.36 request for a writ of prohibition or mandamus.[4] However, because both the majority opinion and Justice Johnstone's separate dissenting opinion reach this case's merits, I state my agreement—subject to the caveat above—with the *Furr* author's (Justice Johnstone's) dissenting opinion. Accordingly, I would reverse and remand for the Court of Appeals to enter an order denying relief.

---

1. Ky., 23 S.W.3d 615 (2000).

2. *Id.* at 618–619 (Cooper, J., dissenting).

3. *Id.* at 618.

4. *See Kentucky Labor Cabinet v. Graham,* Ky., 43 S.W.3d 247, 251 (2001).