# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00625-CV

---

**F. C., Jr. and A. R., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 295,562-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

F.C., Jr. (Father) and A.R. (Mother) appeal the trial court's final decree terminating their parental rights to their triplets, who were almost two at the time of trial. Father and Mother each assert that the trial court made erroneous evidentiary rulings and improperly denied their motions for mistrial and that the evidence is legally and factually insufficient to support the jury's termination findings. For the following reasons, we will affirm the trial court's final termination decree.

## BACKGROUND

The Department filed a petition to terminate Mother's and Father's parental rights to the children in September 2017. An associate judge conducted a bench trial on August 28, 2018, after which it rendered a decree terminating both parents' rights to the children. Mother and Father each filed requests for a de novo hearing and jury trial. *See* Tex. Fam. Code §§ 201.012 (providing for de novo hearing of associate judge's order), .015(i) (providing for jury

trial in de novo hearing if jury trial did not occur in prior proceeding). The district court conducted a four-day jury trial in July 2019, after which it rendered a final decree terminating both parents' rights to the children. Mother and Father filed motions for new trial, which were denied by operation of law, and then notices of appeal.

## STANDARD OF REVIEW

A trial court may terminate a parent's rights to his or her child if clear and convincing evidence shows: (1) the parent has committed conduct that amounts to a statutory ground for termination, and (2) termination of the parent's rights would be in the child's best interest. *Id.* § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). In reviewing the legal sufficiency of the evidence in such a case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014). We "should not disregard undisputed facts that do not support" the determination, and "even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *K.M.L.*, 443 S.W.3d at 113.

In evaluating factual sufficiency, we view the entire record and uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the Department's allegations are true. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). We defer to the factfinder's reasonable determination on issues of credibility that involve an

2

evaluation of appearance or demeanor. *J.P.B.*, 180 S.W.3d at 573; *see A.B.*, 437 S.W.3d at 503 (requiring reviewing court to defer to "factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

We review a trial court's evidentiary rulings for abuse of discretion. *Southwest Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). The appellate court may reverse a trial court's judgment based on an error in the admission or exclusion of evidence only if the appellate court concludes that the trial court made an error of law that probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1). Similarly, we review a trial court's ruling on a motion for mistrial for abuse of discretion, upholding the ruling if it is within the "zone of reasonable disagreement." *S.A., Jr. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00790-CV, 2018 WL 1096012, at *2 (Tex. App.—Austin Mar. 1, 2018, no pet.) (mem. op.).

## SUMMARY OF THE EVIDENCE

The testimony and other admitted evidence relevant to the jury's statutory-predicate and best-interest findings was as follows:

### *Testimony of CPS investigator*

The CPS investigator testified that she became involved with this case in September 2017 after the Department received a report that Mother had been in a car accident while pregnant with triplets, left the hospital after the accident against doctor's orders, and had reported use of methamphetamine and marijuana while pregnant. The investigator testified that Mother told her at their initial meeting that she had used methamphetamine, marijuana, and Adderall during her pregnancy even after she knew that she was pregnant.

3

*Testimony of CPS conservator for the triplets*

The CPS conservator for the triplets testified that the court-ordered Family Service Plan required Mother and Father to take any kind of drug test the Department required, at any time. On several occasions Father refused to take the oral-swab drug tests that the conservator required of him as a condition of having visitations with the triplets; his refusal resulted in his being unable to have the corresponding visitation. The Department considers a refusal to take a drug test a "positive" test, and the Department switched to having Father submit to oral-swab tests because of its concerns about his continued drug use and his attempts to cheat on the tests, which information the conservator obtained from the triplets' caregivers. Father was unable to demonstrate that he had a safe, suitable home for the triplets because he would not allow the conservator to visit his home and did not complete his court-ordered counseling. Mother did not complete her court-ordered counseling and did not stop using drugs, as required by the Family Service Plan.

At trial, it had been about a year since either Mother or Father had seen the triplets. In February 2018 the Department's permanency goal changed from family reunification with a concurrent goal of relative placement to adoption after Mother tested positive a few times for methamphetamine and Father had a methamphetamine-positive hair-follicle test. The change to the adoption goal was an effort to provide the triplets more permanency and stability.

*Testimony of the guardian ad litem*

The children's guardian ad litem testified that she believed it was in their best interest that the parental rights of Mother and Father be terminated. She explained that permanency and stability is of the utmost importance to these young children and that Mother had been unsuccessful after two attempts at outpatient drug rehabilitation during the pendency

4

of this case. She explained that the alternative to termination—permanent managing conservatorship—was not a good option because it would not provide the triplets with the stability that they need because of the potential for Mother and Father to "come and go" in the children's lives.

### *Testimony of triplets' maternal great-grandmother*

The triplets' maternal great-grandmother testified that she was concerned about Mother's and Father's drug use, an example being when she saw what she understood to be an attempt by Mother and Father to cheat on Father's drug test. She decided that because of their continuing drug use, Mother and Father could no longer have visits with the triplets at the foster parents' (her grandson and his wife's) house, where she spent much time caring for the triplets.

### *Testimony of Mother*

Mother testified that she did not know that Father had been using methamphetamine except for a period "way back" before he was placed on probation in 2015. She said that she last used methamphetamine in October 2018. She explained that she was "clean" at the time of the triplets' birth but that the meconium[1] test—which was positive for methamphetamine—"goes back 6 months." She said she had used methamphetamine while pregnant only until she found out she was pregnant, at around three or four months along. However, she continued to use marijuana during her pregnancy because she informed her doctor about her use but the doctor did not tell her to stop. She admitted that the use of methamphetamine and marijuana during pregnancy endangered the well-being of the babies.

---

[1] Meconium is "a dark greenish mass of desquamated cells, mucus, and bile that accumulates in the bowel during fetal life and is discharged shortly after birth." *Webster's Third New Int'l Dictionary* 1401 (2002).

5

She admitted to having taken two drug tests during the pendency of this case that were positive for methamphetamine. She testified that she went into rehab three times since this case began, the last time being inpatient treatment about a year after the triplets were removed. The Family Service Plan allowed her to have visits with her children, supervised by her grandmother, as long as she kept having clean drug tests; those visits ceased when she started using drugs again and refused to take oral-swab tests required by the Department. She testified that she has been continuing to submit to drug tests on her own initiative and at her own expense since the Department ceased requiring them of her and that the tests have shown she is "clean." The trial court admitted into evidence some of her recent clean tests.

Mother testified that she has another child, age nine, of whom she lost custody to the child's father when the boy was two years old. She sees the boy a couple of times a year and does not pay any child support. She did not pay any child support for the triplets over the last year, claiming that she did not know how to reach their foster parents and did not know that she was obligated to provide for the children.

Mother admitted that she stopped going to court-ordered therapy because she believed her therapist was too judgmental.

### Testimony of Father

Father testified that he was currently serving a ten-year term of probation after he received a 2015 deferred adjudication for possession of methamphetamine and assault on a public servant. He explained that he stopped using methamphetamine when Mother found out she was pregnant, around mid-2017. He testified that he last used methamphetamine several months before February 13, 2018, when he tested positive for methamphetamine through a hair-follicle test. He explained that he stopped taking the oral-swab drug tests that the CPS

6

conservator asked him to take because he did not trust her; he understood that his visitation with the triplets would cease due to his refusal to take the oral-swab tests. He said that he last paid child support about a year prior to the trial and that while he had offered to pay the foster parents child support, they refused to accept anything from him. He admitted that he had not tried to send money or any other form of support to the foster parents through his attorney. He also admitted that he had failed to pay child support regularly for his three children from a prior relationship and that their mother and the attorney general had filed an enforcement action against him to collect the arrears.

### *Testimony of foster parents*

The foster parents (Mother's cousin and his wife) both testified that they loved and cared for the triplets as if they were their own children, wanted to adopt them, had cared for them in their home since they were two weeks old, and had been the only parents they knew. They had three children of their own—ages eleven through fifteen—who were bonded with the triplets and played constantly with them. The foster father testified that he planned to ensure the triplets have a good future, and he said that the triplets call him "Father." He explained that his home had a "nanny cam" set up in the kitchen and that he had observed through its live feed that during a visitation supervised by the children's great-grandmother, Father had covered up the camera's lens. One time when Mother was having a supervised visitation, the camera showed her "cussing out" the triplets' great-grandmother, which prompted him to leave work early to attend to the situation.

*Documentary evidence*

*Removal affidavit*

The trial court admitted the Department's removal affidavit, in which the CPS investigator averred that on September 8, 2017, the Department received a report alleging neglectful supervision of the triplets based on Mother's leaving the hospital against medical advice after her accident and returning to the hospital in labor some unspecified time thereafter. The report the Department received indicated that Mother "admitted to using methamphetamine and marijuana during her pregnancy" and that she "was aware of her pregnancy at the time of the use of the illegal substances."

The investigator averred that she interviewed Mother on September 11, 2017, at the hospital. In the interview, Mother "stated she was not using marijuana and methamphetamine often" but "confirmed frequent use of marijuana throughout her pregnancy." Mother also "stated she has used methamphetamine maybe about eight to ten times during her pregnancy . . . [and that] she was aware at the time of use . . . that she was pregnant" and that she has used Adderall she obtained from a friend during her pregnancy. Mother stated that her last use of methamphetamine was about four months prior. Mother agreed to take a drug test on September 15, which was negative.

The investigator averred that she spoke with a medical professional at the hospital on September 15, who stated that the triplets were doing better than expected and were not experiencing withdrawals. The professional stated that the infants' meconium tested positive for methamphetamine and marijuana.

The investigator averred that she contacted Father, who told her that he did not know that Mother had been using methamphetamine and marijuana during her pregnancy and

8

that he wanted his children and had family that could help him care for them. He admitted that he was on probation and takes random monthly drug tests. He agreed to take a drug test for the Department, the results of which the Department received on September 24. The test was positive for methamphetamine. On the same day, the Department removed the triplets from their parents' home and placed them in the care of their maternal great-grandmother.

*Other evidence*

Other documentary evidence included drug-test results for Mother and Father. Mother's tests were taken January 2 and 23, 2018, and were positive for methamphetamine. Father's test was taken on February 13, 2018, and was positive for methamphetamine. The trial court admitted into evidence various temporary orders of the trial court, the Department's Family Service Plan (which was adopted by reference into a temporary order by the trial court), and the orders of deferred adjudication and probation documents relating to Father's criminal history. The trial court also admitted documents offered by Mother and Father, including a record of Father's completion of a parenting class, Father's income statement, Mother's therapy notes and treatment summary from rehab, and Mother's recent self-initiated drug tests.

## DISCUSSION

### Admission of hair-follicle test results

In his first issue, Father complains that the trial court abused its discretion in admitting the February 13, 2018 hair-follicle test results (PX-7) indicating that he tested positive for methamphetamine because it did not meet the standard for expert witness testimony under *E.I. du Pont de Nemours & Co. v. Robinson*. *See* 923 S.W.2d 549, 556–57 (Tex. 1995) (outlining factors trial court may consider in determining whether underlying theories and

9

techniques of proffered scientific evidence are sufficiently reliable).  He specifically contends that (a) neither the business-records affidavit accompanying the test results nor any other evidence demonstrates that the "devices used for testing were properly supervised or maintained" and (b) expert witness testimony was required "to explain the science behind how the rate of hair growth in an individual differs on various parts of the body, and therefore, has varying ranges of time that it can test."

The Department responds that Father did not preserve these arguments for review because the objection he made at trial is not the same as the arguments he raises on appeal.  *See* Tex. R. App. P. 33.1(a) (requiring objection to state grounds for ruling sought from trial court with sufficient specificity to make trial court aware of complaint unless specific grounds are apparent from context); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 159 (Tex. App.—Austin 2017, pet. denied).  We agree with the Department.

Father's objection at trial to the admission of PX-7 follows:

> The—the exhibit that the State would like to offer requires a predicate that has not been laid.  It's hearsay as it stands and the business records affidavit does not cure the hearsay within the document.  Specifically, what we're objecting to is their -- the contents of the document, claiming the document is something that's created in the ordinary course of business with a business of scientific analysis that requires expert testimony.  [Father] does not have the ability or the personal knowledge to lay that predicate.  They have failed to lay that predicate.  They're asking the court hold them to the admissibility standard under 705(b) case law provided previously to the court under *Robinson*.  We're objecting to this evidence on all of those basis [sic].

This objection raised the issues of claimed hearsay in PX-7 and the Department's failure to "lay a predicate" for the drug test by expert testimony.  While his objection referred to Rule of

Evidence 705(b), Father did not specifically request a hearing thereunder,[2] and while he referred to *Robinson*, he did not specify how the exhibit was purportedly deficient and inadmissible, or what predicate an expert was required to lay. In contrast, on appeal Father specifically complains that the exhibit contained no evidence demonstrating that the scientific testing methods used "were properly supervised or maintained" and that an expert witness was required to explain how the "underlying facts and data . . . relate to the relevant time period of the hair follicle." We conclude that his objection at trial does not comport with the issues he raises on appeal and that he has, accordingly, waived the issues. *See Elness Swenson Graham Architects*, 520 S.W.3d at 159.

However, even if Father's objection had preserved his appellate issues, we would conclude that the trial court properly admitted PX-7 as a business record. *See* Tex. R. Evid. 803(6); *In re E.B.*, No. 11-19-00001-CV, 2019 WL 3955974, at *3 (Tex. App.—Eastland Aug. 22, 2019, no pet.) (mem. op.) (rejecting appellant's argument that drug tests admitted as exhibits under business-records exception to hearsay rule required live testimony of expert witness as to authenticity of test, process, and equipment used); *In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480, at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.) (rejecting appellant's contention that drug tests properly admitted under business-records exception needed expert testimony to interpret them); *In re A.T.*, No. 2-04-355-CV, 2006 WL 563565, at *4 (Tex. App.—Fort Worth Mar. 9, 2006, pet. denied) (mem. op.) (rejecting appellant's argument that drug tests admitted as business records needed to show type of equipment used, qualifications of person conducting test, and that tests were standard ones as long as tests demonstrated they

---

[2] Rule 705(a) provides that an expert may state an opinion and give the reasons therefor without first testifying to the underlying facts or data, unless the court orders otherwise. *See* Tex. R. Evid. 705(a). Subsection (b) of that rule provides an adverse party the opportunity to conduct a voir dire examination of the expert before he or she states an opinion or discloses the underlying facts or data supporting it. *See id.* (b).

11

had "sufficient indicia of trustworthiness or reliability"); *cf. In re K.C.P.*, 142 S.W.3d 574, 580 (Tex. App.—Texarkana 2004, no pet.) (concluding that drug tests were improperly admitted as exhibits under business-records exception because they contained "no information as to the qualifications of the person or the equipment used, the method of administering the test, and whether the test was a standard one for the particular substance," indicating lack of trustworthiness).

Because the hair-follicle test was accompanied by an affidavit that complies with Rule of Evidence 902(10)(B), the only question regarding its admissibility was whether the drug test result showed sufficient indicia of trustworthiness to bring it within the business-records exception to the hearsay rule. *See* Tex. R. Evid. 803(6); *A.T.*, 2006 WL 563565, at *4. The accompanying business-records affidavit avers that the drug test "utilize[ed] strict chain of custody procedures" and "was performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a certified scientist and reviewed by a licensed medical review officer." It further avers that a record of the test result was kept in the regular course of business of the Texas Alcohol and Drug Testing Service and that it is in the regular course of business of that entity for an employee or representative with knowledge of the act, event, condition, opinion, or diagnosis to record the information at or reasonably near the time it occurred. The drug test itself was signed by the medical review officer, an MD, verifying that the test was positive. The test result identifies the collection site, date, type of panel test used, and name of the lab that performed the test. Attached also to the business-records affidavit within PX-7 was (a) the laboratory report indicating the quantitative results, identifying the lab as "DHHS Certified," and (b) the "Hair and/or Urine Custody and Control Form" that accompanied the sample Father provided as it was transported from the testing facility to the laboratory. We

12

conclude that the trial court did not abuse its discretion in determining that the drug test and accompanying affidavit showed sufficient indicia of trustworthiness to be properly admitted as a business record. Accordingly, we overrule Father's first issue.

### Admission of the removal affidavit

In her second issue, Mother complains that the trial court abused its discretion in admitting the affidavit of removal offered by the Department because it contained hearsay. At trial, Mother objected to three specific portions of the affidavit: (1) the first paragraph of page two, (2) the third paragraph of page three, and (3) the last sentence of page five.[3] *See In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (noting that objection to hearsay within document must identify which specific parts contain hearsay to preserve error as to those parts). The State responds that the challenged statements in the affidavit were admissible under either the business-records or public-records exceptions to the hearsay rule.

---

[3] Those portions of the affidavit averred:

(1) On September 8, 2017, the Texas Department of Family and Protective Services received a report alleging Neglectful Supervision of [the triplets] by their mother[.] The report stated [that she] was in a car accident and was brought to the hospital for the incident. [The affidavit continues with several more sentences indicating what "the report stated."]

(2) On September 15, 2017 [the] Investigator spoke with a Medical professional[] who stated that the infants are doing better than expected considering the circumstances. The medical professional stated the children are not experiencing any withdrawals. The medical professional stated the triplet[s'] meconium was positive for methamphetamine and marijuana. [The affidavit continues with several more sentences indicating what "the medical professional" stated.]

(3) It is the Department[']s recommendation that the children remain in care of [the great-grandmother] until [Mother] can show she is not engaging in illegal drug abuse, and can provide a stable living environment, gets proper help from a drug rehabilitation program, and receives parenting classes to demonstrate a capability of providing care for the children.

*See* Tex. R. Evid. 803(6), (8). Mother counters that the first exception does not apply because the affidavit was prepared specifically for litigation and therefore does not meet the trustworthiness requirement of Rule 803(6). She also contends that neither exception applies because the affidavit contains hearsay within hearsay. *See id.* R. 805.

When a trial court admits evidence that is hearsay and admissible for a limited purpose, a party may claim error only if the party requests the court to instruct the jury accordingly. *See id.* R. 105(b)(1). While Mother requested that the trial court admit only a redacted version of the affidavit—removing the challenged hearsay statements—she did not request an instruction that the jury consider the affidavit for the limited purpose of proving that the children were removed for abuse or neglect under Chapter 161, and not for the truth of the matters asserted. *See id.* R. 801(d)(2) (defining hearsay as statement offered to prove truth of matter asserted); *see also* Tex. Fam. Code § 161.001(b)(1)(O). Because the challenged out-of-court statements were admissible for another purpose—to prove that the children were removed for abuse or neglect—the trial court did not abuse its discretion by allowing them into evidence for that purpose. Furthermore, absent a limiting instruction, the claim of error in the admission of the hearsay evidence is not preserved for our review. *See* Tex. R. Evid. 105(b)(1); *cf. Ledesma v. State*, No. 01-15-00534-CR, 2016 WL 2930438, at *3 (Tex. App.—Houston [1st Dist.] May 17, 2016, no pet.) (mem. op.); *Delgado v. State*, 235 S.W.3d 244, 251 (Tex. Crim. App. 2007) ("Once evidence has been admitted without a limiting instruction, it is part of the general evidence and may be used for all purposes."). We overrule Mother's second issue.

### Denial of motion for mistrial

Both Mother and Father contend that the trial court abused its discretion in denying their motions for mistrial, which they requested after a witness for the Department

14

testified allegedly in violation of a motion in limine. The witness was the triplets' maternal great-grandmother, with whom the triplets had lived after the Department removed them from their parents' care. The trial court had previously granted in part the parents' motion in limine as to the associate judge's termination findings, noting: "ct grants w/ regard to [associate judge's] findings re termination."

On direct examination, the Department pursued the following line of questioning with the great-grandmother:

> Department: Now, when they were—initially they were placed with you, correct?
>
> Witness: Right, for the first year.
>
> Department: And while they were placed with you, do you know a gentleman and a lady by the name of [the foster mother and foster father]?
>
> Witness: They're the ones—they're my grandson and my granddaughter that I moved in with.
>
> Department: Okay. Now, so initially they were—you had the triplets, but they were living with you.
>
> Witness: I was living with them in their house because my house has got four dogs in it and I didn't want to take them there.
>
> Department: Okay. So you were technically in charge, but they were living—
>
> Witness: I was in charge, but I was living with my grandson. They built a room onto the—their house for me and the babies.
>
> Department: And at some point did it transition to they were officially in charge and you were still there?
>
> Witness: Yes. We went to several, I guess, hearings through court and their rights to the babies were terminated, and then that—at that point they told me I was too old to—to adopt the babies and I would have to find somebody else that would adopt them. So [the foster mother and foster father] had fallen in love with them—
>
> [Counsel for Mother asks to approach the bench.]

15

Mother and Father contend that the above testimony indicating that their rights to the children had previously been "terminated" constituted an "impermissible comment on the weight of the evidence by a judge who had presided over the same cause." *See* Tex. R. Evid. 605; *In re T.T.*, 39 S.W.3d 355, 358–59 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (holding that trial court erred in admitting into evidence temporary order rendered by same judge presiding over final termination proceedings where temporary order made same type of findings that jury would be asked to make because order functioned as improper comment by judge on weight of evidence). We disagree.

Unlike in *T.T.*, here the associate judge's fact findings and termination order were not admitted into evidence; rather, a third-party witness mentioned that Mother's and Father's rights "were terminated," without elaboration and in the context of explaining the triplets' living situation. The facts here, therefore, are distinguishable from those in *T.T.*, wherein the appellate court held that the admission of a temporary order by the judge who was presiding over the final termination hearing—which order included specific findings that the parents had endangered their children—was both hearsay and an impermissible comment on the weight of the evidence by the judge. *See* 39 S.W.3d at 358–59. We believe that any prejudicial effect that may have resulted from the great-grandmother's testimony about the parents' rights having been previously "terminated" could have been cured by an instruction to disregard from the trial court. Mother and Father, however, refused an instruction and instead sought a mistrial. When an instruction to disregard could have cured an objectionable occurrence, the party must request such instruction or will have forfeited appellate review of the issue. *See In re B.W.*, 99 S.W.3d 757, 760 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *S.A.*, 2018 WL 1096012, at \*4.

16

A mistrial is an appropriate remedy only in "extreme circumstances" for "a narrow class of highly prejudicial and incurable errors." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). The remedy "halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). On this record, we cannot conclude that the great-grandmother's testimony was so prejudicial to Mother and Father that an instruction to disregard could not have cured it, and Mother's and Father's respective counsels did not seek an instruction to disregard. The trial court's denial of Mother's and Father's motions for mistrial was well within the "zone of reasonable disagreement," *see S.A.*, 2018 WL 1096012, at *4, and the trial court therefore did not abuse its discretion in denying the motions for mistrial. Accordingly, we overrule Mother's and Father's respective first issues.

*Termination of Mother's rights*

Mother contends that the evidence is legally and factually insufficient to support the jury's findings that (1) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, (2) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for at least nine months as a result of their removal from her by the Department for abuse or neglect, and (3) termination was in the children's best interests. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O), (2).

17

*Statutory-predicate finding*

We first consider whether the evidence was legally and factually sufficient to support the jury's finding that Mother engaged in conduct that endangered the triplets' physical or emotional well-being. *See id.* § 161.001(b)(1)(E). Evidence showed that Mother used methamphetamine and marijuana while she was pregnant with the triplets, even after she knew that she was pregnant. Evidence showed that she continued to use methamphetamine after her children had been removed, despite the requirement in the Family Service Plan that she abstain from the use of illegal drugs and her knowledge that her visitation with the triplets would be thereby jeopardized and that her visitations would cease upon her refusals to submit to oral-swab testing. Mother had been using methamphetamine since she was 21 years old and was 28 at the time of trial.

A mother's use of illegal drugs during pregnancy is an act that jeopardizes a child's well-being because it exposes the child to the possibility of being born with adverse medical conditions, even if there is no actual injury that results. *See In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *3 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.). Furthermore, a parent's continued use of illegal drugs after her children are removed places her visitations and, thus, relationship with her children at risk. *See In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re S.M.L.D.*, 150 S.W.3d 754, 757–58 (Tex. App.—Amarillo 2004, no pet.).

Considering the evidence in the light most favorable to the jury's subsection (E) finding, we conclude that the jury could reasonably have formed a firm belief or conviction that Mother engaged in conduct that endangered the triplets' physical or emotional well-being. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Furthermore, there was no significant disputed

18

evidence that would render such finding unreasonable. *See id.* Therefore, the evidence was legally and factually sufficient to support the jury's subsection (E) finding. Because only one predicate finding is required to support termination, *see In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not review the jury's subsection (O) finding.

>    *Best-interest finding*

>    A factfinder's best-interest determination is reviewed in light of the non-exhaustive list of considerations set out in *Holley v. Adams*: the child's wishes, if the child is of an appropriate age to express such wishes; the child's present and future emotional and physical needs; present and future emotional and physical danger to the child; the parenting abilities of the individuals seeking custody; programs available to assist those people to promote the child's best interest; plans for the child by the people or agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the parent-child relationship is improper; and any excuse for the parent's acts or omissions. 544 S.W.2d 367, 371–72 (Tex. 1976).

>    The Department is not required to prove all of the *Holley* factors "as a condition precedent to parental termination," and a lack of evidence of some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence presented to satisfy a predicate statutory-ground finding may also be probative of the child's best interest. *Id.* at 28. We summarize the evidence bearing on only those *Holley* factors on which there is relevant evidence in the record.

"The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). While there was no evidence about any physical and emotional needs unique to the triplets, the guardian ad litem testified that permanence and stability were especially important to them, considering the possibility of Mother's and Father's going in and out of their lives.

The jury heard evidence that Mother's illegal drug use occurred while she knew she was pregnant with the triplets and that she knew such behavior was endangering to them. Mother continued to use illegal drugs during the pendency of this case, and although some evidence indicated that she had abstained from drugs in the months leading up to trial, the jury could have reasonably concluded that her long history of drug use was likely to pose future physical and emotional danger to the children. Mother did not complete her court-ordered therapy, nor did she submit to all of the Department's requested drug tests.

The foster parents had experience raising three children of their own and were providing a loving, safe home for the triplets. They had plans to raise the triplets as their own upon adoption and to ensure that they had a good future. They had provided the triplets with a stable home since they were two weeks old. Mother did not identify her plans for the children or explain how she would be able to provide them stability and hoped to remain in a relationship with Father, despite their respective histories of drug use.

Considering the evidence in the light most favorable to the jury's best-interest finding, we conclude that the jury could reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in the triplets' best interest. *See J.F.C.*, 96 S.W.3d

20

at 266. Furthermore, there was no significant disputed evidence that would render such finding unreasonable. *See id.* Therefore, the evidence was legally and factually sufficient to support the jury's best-interest finding, and we accordingly overrule Mother's third and final issue.

## *Termination of Father's rights*

Father contends that the evidence is legally and factually insufficient to support termination of his parental rights on the basis of the trial court's findings that (1) he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical or emotional well-being of the children, (2) he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for at least nine months as a result of the children's removal from him by the Department for abuse or neglect, and (3) termination of his parental rights was in the best interest of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O), (2).

### *Statutory-predicate finding*

We first consider whether the jury's subsection (E) finding was supported by legally and factually sufficient evidence. *See id.* § 161.001(b)(1)(E). As noted above with respect to Mother, a parent's drug use that continues after a child is removed from the parent's care, in the face of periodic drug tests that place the parent's relationship with his child in jeopardy, is evidence of an endangering course of conduct. *J.S.*, 584 S.W.3d at 635; *S.M.L.D.*, 150 S.W.3d at 758. A parent's criminal history is also a factor that may be considered when determining if the parent has engaged in an endangering course of conduct, because routinely

21

subjecting a child to the probability that the child will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *J.S.*, 584 S.W.3d at 635.

Father was in the first half of a ten-year term of probation for a drug and assaultive offense at the time of trial and when he used methamphetamine and refused to take drug tests. Evidence supported an inference that he attempted to cheat on drug tests. This evidence shows that Father had a continuing problem with substance abuse that persisted throughout the termination proceedings and that his drug use put him at a high risk of being incarcerated. Texas courts have repeatedly held that a parent's illegal drug usage, even after removal of the child from the home and during the pendency of termination proceedings, may establish an endangering course of conduct because it creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting. *Id.* at 636. Additionally, Father knowingly relinquished his limited visitation with the triplets by refusing to take oral-swab drug tests, which put his relationship with the triplets—during the very time when that relationship was in jeopardy by virtue of these proceedings—at further risk. *See S.M.L.D.*, 150 S.W.3d at 757–58.

Considering the evidence in the light most favorable to the jury's subsection (E) finding, we conclude that the jury could reasonably have formed a firm belief or conviction that Father engaged in conduct that endangered the triplets' physical or emotional well-being. *See J.F.C.*, 96 S.W.3d at 266. Furthermore, there was no significant disputed evidence that would render such finding unreasonable. *See id.* Therefore, the evidence was legally and factually sufficient to support the jury's subsection (E) finding. Because the evidence supports the subsection (E) finding, we need not review the jury's subsection (O) finding. *See A.V.*, 113 S.W.3d at 362.

*Best-interest finding*

Father also challenges the legal and factual sufficiency of the jury's best-interest finding. Most of the evidence summarized above in our best-interest analysis as it pertains to termination of Mother's rights also pertains to termination of Father's rights, and he similarly did not present evidence of his plans for the children or of several other of the *Holley* factors. Furthermore, the evidence relating to his endangering course of conduct weighs heavily in favor of termination. Our review of the record demonstrates that the evidence is legally and factually sufficient to support the jury's best-interest finding. Accordingly, we overrule Father's third issue.

## CONCLUSION

Having overruled each of Mother's and Father's respective issues, we affirm the trial court's final decree terminating the parental rights of Mother and Father to their three children.

_____
Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: January 9, 2020